585 A.2d 1151

**W.C. McQUAIDE, INC., Petitioner,**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 1, 1990.

Decided Jan. 17, 1991.

284

David H. Radcliff, with him, Christian V. Graf, Graf, Andrews & Radcliff, P.C., Harrisburg, for petitioner.

Karen Oill Moury, Asst. Counsel, with her, H. Kirk House, and John F. Povilaitis, Chief Counsel, Harrisburg, for respondent.

William J. Lavelle, Vuono, Lavelle & Gray, for intervenor, Birk Transfer, Inc.

Before COLINS and BYER, JJ., and NARICK, Senior Judge.

BYER, Judge.

In this dispute between rival trucking companies, W.C. McQuaide, Inc. (McQuaide) appeals from an order of the

Pennsylvania Public Utility Commission (PUC) which adopted the decision of an administrative law judge (ALJ) approving the application of Birk Transfer, Inc. (Birk) for additional transportation authority. We affirm.

From June 1980 to November 1981, Birk transported railroad cars and locomotive wheels for ABEX Corporation/Stoney Creek Steel, Inc. (ABEX), from ABEX's facilities in Quemahoning Township, Somerset County to points in Pennsylvania and in other states pursuant to certificates of authority Birk had obtained from the PUC and Interstate Commerce Commission (10a–12a). In November 1981, ABEX closed its Quemahoning Township facilities. In 1984, ABEX reopened the Quemahoning facilities, producing and shipping steel ingots (12a–13a). In April 1988, Birk began transporting these steel ingots (14a). In so doing, Birk replaced McQuaide as primary carrier for the ABEX traffic (86a).

ABEX questioned Birk's authority to transport the ingots; therefore, in August 1988, Birk requested its lawyer to interpret its existing certificate. Birk's lawyer believed that the certificate could be interpreted to permit the transportation of steel ingots; however, Birk's lawyer also thought that the certificate could be interpreted differently, so on October 18, 1988, Birk filed an application with the PUC seeking additional authority "[t]o transport, as a class D carrier, property (except household goods and office furniture, in use), from points in the township of Quemahoning, Somerset County, to points in Pennsylvania, and vice versa." (228a). McQuaide and others protested Birk's application.

By letter dated March 28, 1989, Birk revised its application as follows:

> To transport, as a Class D carrier, property from points in the township of Quemahoning, Somerset County, to points in Pennsylvania, and vice versa.

> Subject to the following conditions:

That no right, power or privilege is granted to transport household goods and office furniture, in use; petroleum and petroleum products, in bulk in tank vehicles; and commodities in bulk, in dump vehicles (except scrap metal).

(229a).

Based upon Birk's revised application, all protesters except McQuaide withdrew their protests. The ALJ conducted a hearing, at which Birk and McQuaide presented testimony and various exhibits. At the conclusion of the hearing, Birk moved for dismissal of its application as unnecessary, contending that Birk's existing operating authority already allowed the transportation of commodities throughout the area of the application (132a).

The ALJ denied Birk's motion to dismiss the application, but approved it. Although the ALJ found that Birk's existing certificate did not authorize the shipping of steel ingots, he concluded that Birk's unauthorized service for ABEX resulted from a good faith misunderstanding of the scope of its authority. The ALJ considered evidence of Birk's past service in addition to the public's need to be served by Birk. In approving Birk's revised application, the ALJ concluded that Birk had the technical and financial ability to operate safely and legally. Finally, the ALJ found that McQuaide failed to show that approval of Birk's additional authority would impair or endanger McQuaide's operations to such an extent that it would be contrary to the public interest. The PUC adopted the ALJ's decision. McQuaide appealed to this court, and Birk has intervened.

McQuaide makes the following arguments on appeal: (1) no substantial evidence supports the PUC's finding that Birk's unauthorized service to ABEX resulted from a good faith misunderstanding of its existing certificate, but the evidence instead demonstrates that Birk operated illegally; (2) the PUC erred in accepting evidence of public need, because Birk operated illegally in shipping steel ingots for ABEX; (3) the PUC's finding that Birk is financially fit to provide the proposed service is unsupported by substantial

evidence; and (4) the PUC erred in failing to find that McQuaide's operation would be seriously harmed by granting Birk additional authority.

## STANDARD OF REVIEW

We may reverse a PUC decision only where appellant demonstrates a violation of constitutional rights, an error of law or lack of substantial evidence to support the PUC's findings of fact. *Pittsburgh–Johnstown–Altoona Express, Inc. v. Pennsylvania Public Utility Commission*, 123 Pa.Commonwealth Ct. 237, 554 A.2d 137 (1989); *Morgan Drive Away, Inc. v. Pennsylvania Public Utility Commission*, 99 Pa.Commonwealth Ct. 420, 512 A.2d 1359 (1986); *Yellow Cab Co. of Pittsburgh v. Pennsylvania Public Utility Commission*, 50 Pa.Commonwealth Ct. 448, 412 A.2d 1385 (1980). We defer to the PUC on matters within its administrative expertise. *Equitable Gas Co. v. Pennsylvania Public Utility Commission*, 106 Pa.Commonwealth Ct. 240, 526 A.2d 823 (1987). We will not substitute our discretion for the discretion properly exercised by the PUC. *Norfolk and Western Railway Co. v. Pennsylvania Public Utility Commission*, 489 Pa. 109, 413 A.2d 1037 (1980). *See Lincoln Intermediate Unit v. Department of Labor*, 131 Pa.Commonwealth Ct. 439, 443, 570 A.2d 637, 639 (1990).

We review each of McQuaide's arguments according to these precepts.

## GOOD FAITH MISUNDERSTANDING

On September 6, 1979, the PUC authorized Birk to transport, among other things, "materials, supplies and equipment *used or useful* in the production, assembly and distribution of railroad cars and locomotive wheels, from points in the township of Quemahoning, Somerset County, to points in Pennsylvania, and vice versa." (emphasis added) (140a). When Birk requested its lawyer to interpret this authority in August 1988, the lawyer advised Birk that no PUC decision specifically interpreted the combined terms

"used or useful in." (162a–163a). Birk asserts that only "[o]ut of an abundance of caution," it filed the revised application, coupled with a motion to dismiss the application on the basis that it already possessed the necessary authority (Birk's brief, 8).

McQuaide asserts that this evidence does not demonstrate a good faith misunderstanding, because from 1983 to the date of the hearing, seven complaints were filed against Birk, five of which resulted in fines against Birk for providing services beyond the scope of its certificates of authority (176a–204a). Therefore, McQuaide argues that Birk had the propensity to operate illegally, and because Birk operated illegally, the PUC should have found Birk unfit to receive an additional grant of authority. McQuaide cites *Bunting Bristol Transfer Inc. v. Pennsylvania Public Utility Commission*, 418 Pa. 286, 210 A.2d 281 (1965), and *D.F. Bast, Inc. v. Pennsylvania Public Utility Commission*, 397 Pa. 246, 154 A.2d 505 (1959), in support of its position.

In *Bunting Bristol*, a certified motor carrier applied for extended authority after illegally operating for a number of years. The applicant had been fully aware of the limited scope of its certificate but continued to operate after being admonished by the PUC for the violation. The PUC nevertheless granted the additional authority based upon a public need for such service. The Supreme Court reversed the grant of the additional authority, because the evidence upon which the PUC based its findings of public need arose from service rendered patently in violation of applicant's certified rights and was clearly an illegal operation. The Supreme Court specifically noted that the applicant did not render services under a good faith misunderstanding.

The mere fact of prior operation without commission approval is not per se equivalent to an offense which will prohibit absolutely the acquisition of proper authority when application is subsequently made. The distinction between those violations which are prohibitive and those which will be accepted as competent evidence is, to a large degree, dependent upon the existence of good faith.

If the violation is the result of a bona fide misunderstanding of the service authorized by the commission, there is no substantial basis, either legally or morally, to object to its use in a certification proceeding. (citations omitted). On the other hand, where the violation is one resulting from a deliberate disregard of the certificate limitations or the law, then, of course, the wrongdoer should not profit from his own deliberate wrong.

418 Pa. at 290–291, 210 A.2d at 283, citing *Lancaster Transportation Co. v. Pennsylvania Public Utility Commission*, 181 Pa.Superior Ct. 129, 138, 124 A.2d 380, 385 (1956).

In *Bast*, the applicant also applied for additional operating authority. The PUC considered the testimony of the applicant and a shipper regarding public need even though the applicant admitted to operating illegally. The Supreme Court held that the PUC could not consider and must exclude evidence of illegal operations deliberately rendered on the part of an applicant and related shipper.

*Bunting Bristol* and *Bast* are distinguishable and do not compel us to reverse the PUC here. The evidence does not conclusively establish that Birk flouted the law by deliberately acting beyond its operating authority. Birk did not admit that it acted illegally. Birk introduced evidence that it believed its initial certificate permitted the shipping of steel ingots, and the PUC specifically found that Birk acted under a good faith misunderstanding. This finding brings the case within the exception recognized by the Supreme Court in *Bunting Bristol*. Under our standard of review, the pivotal question is whether substantial evidence supports PUC's finding that Birk acted under a good faith misunderstanding.

We have defined substantial evidence as such "relevant evidence that a reasonable mind without weighing the evidence or substituting its judgment for that of the factfinder, might accept as adequate to support the conclusion reached." *Samuel J. Lansberry, Inc. v. Pennsylvania Public Utility Commission*, 134 Pa.Commonwealth Ct. 218,

221, 578 A.2d 600, 601 (1990), citing *Gallo v. Workmen's Compensation Appeal Board (United Parcel Service)*, 95 Pa.Commonwealth Ct. 158, 163, n. 1, 504 A.2d 985, 988, n. 1 (1986). The PUC, as the ultimate factfinder, determines the weight and the credibility of the evidence presented. *Metropolitan Edison Co. v. Pennsylvania Public Utility Commission*, 62 Pa.Commonwealth Ct. 460, 437 A.2d 76 (1981). We will not indulge in the process of weighing evidence and resolving conflicts but defer to the PUC's determinations as factfinder unless they are not supported by substantial evidence. *Middletown Township v. Pennsylvania Public Utility Commission,* 85 Pa.Commonwealth Ct. 191, 482 A.2d 674 (1984).

 McQuaide's argument essentially challenges the PUC's weighing of conflicting evidence. We decline to reweigh the evidence. Based upon our review of the record, we hold that the PUC's finding of a good faith misunderstanding is supported by substantial evidence and not based upon speculation. *Limelight Limousine v. Pennsylvania Public Utility Commission*, 135 Pa.Commonwealth Ct. 316, 580 A.2d 472 (1990). We further hold that the PUC did not commit an error of law in ruling that Birk's acting under a good faith misunderstanding of the extent of its authority does not disqualify Birk from obtaining additional authority.

## PROOF OF PUBLIC NEED

 McQuaide asserts that the PUC improperly considered Birk's unauthorized service for ABEX as proof of public need for such service. Under the PUC's regulations, "[a]n applicant seeking motor common carrier authority has a burden of demonstrating that approval of the application will serve a useful public purpose, responsive to a public demand or need." 52 Pa.Code § 41.14(a). McQuaide asserts that in attempting to meet this burden of proof, Birk presented only evidence of the unauthorized service it performed for ABEX. McQuaide argues that PUC erred in overruling its objection to this evidence, because in *Nation-*

*al Retail Transportation v. Pennsylvania Public Utility Commission*, 109 Pa.Commonwealth Ct. 72, 530 A.2d 987 (1987), we held that a shipper's testimony that an applicant provided illegal service cannot be considered as evidence of public need for the service.

■ We hold that the facts in this case did not require the PUC to disregard the evidence of Birk's service to ABEX, because the PUC found that Birk provided the service as a result of a good faith misunderstanding of its existing certificate. Where an applicant provides service as a result of a good faith misunderstanding of its certificate, the PUC may consider the evidence concerning the service in determining whether the applicant has proven a public need exists for the proposed service. *Brinks, Inc. v. Pennsylvania Public Utility Commission*, 500 Pa. 387, 456 A.2d 1342 (1983); *Gettysburg Tours, Inc. v. Pennsylvania Public Utility Commission*, 42 Pa.Commonwealth Ct. 399, 400 A.2d 945 (1979).

## FINANCIAL FITNESS

■ McQuaide asserts substantial evidence does not support the PUC's finding that Birk is financially fit to provide the service.

The PUC's regulations provide:

An applicant seeking motor common carrier authority has the burden of demonstrating that it possesses the technical and financial ability to provide the proposed service, and, in addition, authority may be withheld if the record demonstrates that the applicant lacks a propensity to operate safely and legally.

52 Pa.Code § 41.14(b).

McQuaide asserts that Birk is not financially sound because: (1) Birk has a negative retained earnings which accumulated from previous losses in 1979, 1980 and 1981 (50a–51a); and (2) Birk should not be able to rely upon revenue generated from its illegal service to ABEX to

improve its financial picture. We find no error by the PUC in rejecting these arguments.

Although Birk did suffer losses in 1979–1981, the evidence shows that during 1988, Birk had a profit of $279,347 which reduced its deficit capital position by 77%. (160a–170a). Birk has been in business since 1936. Thus, the PUC, presented with conflicting evidence, found Birk to be financially sound.

 We hold that because the PUC found that Birk provided the service to ABEX under a good faith misunderstanding of the scope of its certificate, the PUC was entitled to consider Birk's revenues from ABEX on the issue of Birk's financial fitness.

The PUC's finding that Birk is financially capable of providing the service not only is supported by substantial evidence but relates to a matter within the administrative expertise of the PUC. We see no basis to disturb this finding.

## ADVERSE EFFECT ON OPERATIONS

 McQuaide argues that the PUC erred in finding that McQuaide would not be adversely affected by granting Birk additional authority.

The PUC's regulations provide:

The Commission will grant motor common carrier authority commensurate with the demonstrated public need unless it is established that the entry of a new carrier into the field would endanger or impair the operations of existing common carriers to such an extent that, on balance, the granting of authority would be contrary to the public interest.

52 Pa.Code § 41.14(c).

McQuaide had handled the ABEX traffic as primary carrier before Birk began performing services for ABEX (86a). McQuaide asserts that Birk was able to take over the ABEX traffic because it charged less than compensatory rates, thereby engaging in destructive competition. Al-

though McQuaide demonstrated a $22,620 operating loss in 1988, the record fails to disclose that this loss is in any way attributable to Birk's actions. Thus, the PUC did not err in finding that the additional grant of authority to Birk would not endanger or impair McQuaide's operations.

\* \* \*

Although this case is cast as an appeal from the PUC, it essentially is an effort by McQuaide to avoid competition by Birk. McQuaide has failed to demonstrate any basis upon which the law may insulate it from this competition. If McQuaide is to prevail against Birk, it will have to be in the marketplace. We affirm.

## ORDER

We affirm the order of the Pennsylvania Public Utility Commission.